CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 19 2007

JOHN F. CORCORAN, CLERK
BY: O. Thompson
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| J. ANDREW RAKER,<br>    Plaintiff,<br><br>v.<br><br>FREDERICK COUNTY PUBLIC<br>SCHOOLS; J. RICHARD PLAUGHER,<br>individually and in his official capacity<br>as Director of Student Support Services<br>for Frederick County Public Schools;<br>JOSEPH J. SWACK, individually and<br>in his official capacity as Principal of<br>Millbrook High School;<br>    Defendants. | Civil Action No. 5:06-CV-00122<br><br>**MEMORANDUM OPINION**<br><br>By: Samuel G. Wilson<br>United States District Judge |

    This is an action for declaratory and injunctive relief by Plaintiff, J. Andrew Raker ("Raker") pursuant to 42 U.S.C. § 1983 for infringement of his rights to freedom of speech in violation of the First and Fourteenth Amendments to the United States Constitution against Defendants, Frederick County Public Schools ("FCPS"), J. Richard Plaugher, the Director of Student Support Services for FCPS, and Joseph J. Swack, the former Principal of Millbrook High School ("Millbrook"). Raker is an eighteen-year-old student in the twelfth grade at Millbrook who seeks a preliminary injunction permitting him to distribute abortion literature during the non-instructional times of the school day at Millbrook, including in the cafeteria during his lunch period, in the hallways between classes, and on the Millbrook campus before and after school. Defendants seek to enforce School Board Regulation 618R ("Regulation"), which imposes multiple restrictions on the dissemination and posting of non-school materials on school property. For the purpose of this preliminary injunction, Raker challenges the

constitutionality of the Regulation's time, place, and manner restriction that limits the distribution of "more than one (1) copy of non-school materials" to "before and after the instructional day," charging that the provision is overly broad and impinges on Raker's free speech rights. Defendants contend that the challenged provision, in light of the school's educational mission, is a reasonable and viewpoint neutral time, place and manner restriction and is therefore, constitutionally sound. However, in light of the fact that the school has neither alleged, nor demonstrated that the prohibited "speech" would cause a disruption in the operation of the school and because the scope of the policy is patently unreasonable due to its overbreadth, the court finds that the challenged provision is unconstitutional and therefore will preliminarily enjoin its enforcement.

I.

The Plaintiff, Andrew Raker, is a twelfth grade student at Millbrook High School in Winchester, Virginia. For self-proclaimed religious and ethical reason, Rakers desires to distribute abortion literature to his fellow students during the non-instructional times of the school day, including in the hallways and in the cafeteria. On October 24, 2006, as a participant in the "3rd Annual Pro-Life Day of Silent Solidarity," Raker wore symbolic clothing to school and distributed small flyers to fellow students during non-instructional times of the school day, including between classes and during his lunch period, that advocated against abortion and described prenatal development. Raker claims that he participated in substantially similar activities at Millbrook in 2004 and 2005 and that no disruption occurred on any occasion, a fact

2

that the Defendants do not deny.[1] In addition to passing out his flyers to students on October 24, 2006, Raker also gave Joseph Swack, the principal of Millbrook at the time, a copy of his abortion material and spoke with Swack about starting a pro-life club at the school. The next day, Swack called Raker to his office to inform him that he could not distribute flyers during school hours but that he could do so before and after school.[2]

After Raker's conversations with Swack on October 24 and 25, Raker contacted legal counsel for advice. On November 13, 2006, Raker's attorney wrote a letter to Swack, which noted that Millbrook had no written provision which restricted Raker's expressive activity and requested that Raker be permitted, among other things, to distribute his flyers during non-instructional time. The school division, through Defendant Plaugher, responded in writing on November 22, 2006, informing Raker that he could distribute his flyers only before and after school. Plaugher did not cite any written policy. The school division then formulated a written

---

[1] In describing the normal mechanics of his literature distribution that occurs during the five minutes between classes, Raker testified that he approaches individuals and groups of students who are normally at their lockers or standing in clusters in the hallways and offers them a flyer, suggesting that they read it and that it contains useful information. If a student declines to take his flyer, Raker purportedly accepts this choice and moves on quickly to approach other students. Raker testified that he has never been late to class as a result of his flyer distribution and denies having caused any other students to be tardy for class. Furthermore, Raker is unaware of any congestion in pedestrian traffic that his flyer distribution has caused.

Raker testified that his flyer distribution in the Millbrook cafeteria during the twenty-three minute lunch period generally takes the same form: after he finishes eating, he walks around the cafeteria, offering flyers to students sitting at or standing around lunch tables. Raker claims that students do not have assigned seats in the cafeteria and that students are free to leave their seats. Furthermore, Raker denies having ever seen fellow students discard the flyers onto the floor as litter.

[2] There are factual disputes as to other aspects of the Swack-Raker interaction; however, they do not need to be resolved in order to rule upon the issues involved with the preliminary injunction.
3

set of rules to govern the distribution of "non-school materials," which the school designated as "Regulation 618R." The Regulation was approved by Patricia Taylor, the Superintendent for FCPS, on January 5, 2007.

The Regulation gives students who, like Raker, are not associated with an approved student organization or curricular program, no option for the "distribution"[3] of "non-school materials" during the school day.[4] After the student has obtained mandatory pre-approval of the contents of the proposed material,[5] the student may distribute the material only "before and after the instructional day." In omitting any other options for student literature distribution on school premises, the Regulation virtually bans the circulation of all written communication during the instructional day, including during lunchtime and between classes.[6]

On January 12, 2007, this court held a hearing on Raker's motion for a preliminary

---

[3] The Regulation defines "*distribution*" to mean "dissemination of more than one (1) copy of written literature, drawings or symbols on school property, or posting of such material in areas of the school which are designated for that purpose."

[4] The Regulation defines "*non-school materials*" to mean "any item or matter that has not been properly approved and authorized in advance for use in the school as part of curricular or school-sponsored programs or activities, whether or not purchased with school funds."

[5] The Regulation provides that the principal shall approve the material for distribution provided that:
"1. The material on its face bears the name of the person or entity proposing or sponsoring its distribution;
    2. The material does not contain obscene or profane words or images; and
    3. The material is not defamatory."

[6] While Raker acknowledges that the school has permitted him to convey his message through word of mouth, he claims to prefer written communication over oral because it allows him to disseminate his message more quickly. Similarly, Raker admits that the school has allowed literature distribution to take place before and after school; however, he claims to prefer to pass out his flyers between classes and during lunch because he can access students easier during the school day.

4

injunction to enjoin enforcement of the challenged provisions. At this hearing, the court received all affidavits and exhibits into evidence that had been submitted previously, heard testimony from Andrew Raker,[7] and heard arguments from both sides. Raker maintains that the Regulation is overly broad and that the school must be enjoined because it has not shown that Raker's literature distribution poses a risk of disruption. In contrast, Defendants contend that the Regulation merely imposes a reasonable time, place and manner restriction. They argue that the court should defer to the "collective administrative judgment of school division administrators" and their determination that "students should not be subjected to the potential delay and intrusion associated with the distribution of non-school material."[8]

## II.

In determining whether to grant a preliminary injunction a court must balance four factors: "(1) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (2) the likelihood of harm to the defendant if it is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest." Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Sch., 373 F.3d 589, 593 (4th Cir. 2004). If the balance of hardships tips decidedly in favor of the moving party, "a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, so substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Direx

---

[7] Raker's testimony is summarized in Footnote 1, supra.

[8] The Regulation itself explains that the distribution restrictions are meant to "regulate the time, place and manner of distribution of non-school materials" so as to "minimize intrusions on the time of students and employees, to maintain order and decorum in the school environment, and to prevent disruptions or distractions from the educational mission of the schools."

5

Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 813 (4th Cir. 1991) (citations omitted). However, if the balance does not tip decidedly in favor of the moving party, there must be a "strong probability of success on the merits." Id. (citations omitted). Finally, the plaintiff has the "burden of establishing that each of these factors supports granting the injunction." Id. at 812.

In this case, the irreparable harm that Raker has alleged is inseparably linked to his claim of a violation of his First Amendment rights. Therefore, determination of irreparable harm requires the court to first analyze Raker's likelihood of success on the merits. The court must decide whether the Defendants' Regulation, which limits distribution of "non-school materials" to "before and after the instructional day" is unconstitutional on its face because it suppresses expression that is protected by the First Amendment.

Raker argues that on the basis of Newsom v. Albemarle County Sch. Bd., 354 F.3d 249 (4th Cir. 2003), and Tinker v. Des Moines Indep. Cmty. Sch. Dist. 393 U.S. 503 (1969), any time, place, and manner regulation must be supported by a finding of disruption sufficient to satisfy the Tinker standard. Because the school district cannot point to any past or potential disruption, Raker contends, the restriction is invalid. In contrast, Defendants argue that content-neutral regulations such as the Regulation's time, place, and manner restrictions "do not have to satisfy Tinker's disruption standard in order to pass constitutional muster." Instead, Defendants claim that forum analysis should be used to determine the constitutionality of the Regulation's time, place, and manner restriction. Defendants argue that the school's hallways, cafeteria, and other similar areas of the school during the instructional day are properly classified as "closed fora" and that their imposed time, place, and manner restrictions pass constitutional muster because the restrictions are viewpoint neutral and are "reasonable" in light of the school's

6

educational mission. They also argue that the time, place, and manner restrictions are valid even if the court classifies the halls and cafeteria as "limited public fora."

Courts have consistently recognized that a public school student's First Amendment rights are "not coextensive to those held by others in other contexts," Newsom v. Albemarle County Sch. Bd., 354 F.3d 249, 255 (4th 2003) (citing Bethel Sch. Dist. No 403 v. Fraser, 478 U.S. 675, 682 (1986)), as "most public school students are minors and school administrators have the duty to provide and facilitate education and to maintain order and discipline." Id. However, students retain protection for speech that threatens neither order nor discipline. As the Supreme Court has noted, "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty. Sch. Dist. 393 U.S. 503, 506 (1969). Thus, the Court has found, for example, that the First Amendment protected high school students who wore black arm bands during the school day to protest the Vietnam War, reasoning that students retain First Amendment rights at school, which school administrators may suppress if they reasonably "forecast substantial disruption of or material interference with school activities." Id. at 514. In recognizing that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression" in our schools, id. at 508, the Court reiterated that the "comprehensive authority" of schools officials must be exercised consistently with "fundamental constitutional safeguards." Id. at 507.[9]

---

[9] As the Newsom court explains, the Supreme Court has further defined the scope of First Amendment freedoms in public schools. See Newsom, 354 F.3d at 255-57. First, in Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675 (1986), the Supreme Court established an exception to Tinker's disruption requirement in that speech in school can also be banned if it is vulgar, lewd, or plainly offensive. Id. at 685. Second, in Hazlewood Sch. Dist v. Kuhlmeier, 484 U.S. 260

7

Applying Tinker's disruption standard, it is clear that by devising a policy that limits the distribution of non-school material to before and after the school day without any history or reasonable fear of literature distribution "materially disrupt[ing] class work or involv[ing] substantial disorder or invasion of the rights of others[,]" id. at 513, the school district acted with merely a "remote apprehension of disturbance" rather than "a specific and significant fear of disruption." Newsom, 354 F.3d at 255 (quoting Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 211 (3d Cir. 2001)). While Defendants claim that its policy is "based upon an imperative to maintain effective and orderly spaces to promote the delivery of academic instruction," there is no evidence in the record that demonstrates that literature distribution by Raker or other students has ever substantially disrupted school operations or is reasonably anticipated to do so in the future. See also Newsom, 354 F.3d at 259 (enjoining a viewpoint neutral clothing policy as overbroad because of the complete lack of a history or reasonable expectation of substantial

---

(1988), the Court limited Tinker's application even further by carving out a rule for school-sponsored speech: "[E]ducators do not offend the First Amendment by exercising editorial control over the style and content of student speech in *school-sponsored expressive activities* so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273 (holding that a high school newspaper published by students in a school-sponsored journalism class did not qualify as a public forum, so that school officials retained the right to impose reasonable restrictions on student speech and could properly exclude articles about pregnancy and divorce). The Kuhlemeier court distinguished Tinker by noting that "The question whether the First Amendment requires a school to tolerate particular student speech - the question that we addressed in Tinker – is different from the question whether the First Amendment requires a school affirmatively to promote particular student opinion." Id. at 270-71.

The Defendants' Regulation cannot be judged using the more lenient Hazlewood standard because "the special circumstances present in Hazlewood are so clearly absent in this case." Newsom, 354 F.3d at 257. Raker's abortion literature is not school-sponsored, nor a part of the school curriculum. Therefore, Tinker and Fraser, rather than Kuhlemeier, guide this court's analysis.

8

disruption). Defendants claim that they have grave concerns about congestion and littering; however, they cite no past incidents of these problems, nor explain why they anticipate these problems might suddenly materialize. These fears seem especially unsubstantiated in light of the undisputed fact that Raker peacefully distributed abortion literature without incident during 2004 and 2005.

Defendants' Regulation also fails under a forum analysis, where the type and extent of restrictions that government lawfully may impose on protected speech vary with the nature of the forum. "Traditional public fora" are places, such as streets and parks, that "by long tradition or by government fiat have been devoted to assembly and debate. Perry Educ. Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37, 45 (1983). In a traditional public forum, "the rights of the State to limit expressive activity are sharply circumscribed," as the state may enforce "regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Id. Furthermore, any content-based restrictions are valid only if they are "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." Id.

A "nonpublic form" consists of "[p]ublic property which is not by tradition or designation a forum for public communication." Id. at 46. In such locations, government regulation of speech is valid, such a content neutral time, place, and manner restrictions, are valid as long as the "regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Id.

The third category is a "hybrid" of the other two fora. See Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Sch., 457 F.3d 376, 382 (4th Cir. 2006). In "a limited

9

public forum," the government grants access to a specific or limited type of expression where one did not previously exist. In this type of forum, the state may reserve "for certain groups or for the discussion of certain topics, subject only to the limitation that its action must be viewpoint neutral and reasonable." Id.[10]

Regardless of whether the court classifies the Millbrook hallways and cafeteria as closed fora or limited public fora, the Regulation's restriction of the distribution of written materials to before and after school fails even the least exacting reasonableness test, especially when viewed in light of Tinker's disruption principle. See Tinker, 393 U.S. at 512-13 ("A student's rights . . . do not embrace merely the classroom hours. When he is *in the cafeteria, or on the playing field, or on the campus during the authorized hours,* he may express his opinions, even on controversial subjects . . .if he does so without materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others.") (emphasis added) (citations omitted). While school officials certainly must have the latitude to ensure the "orderly and effective conduct of educational activities," Defendants' policy attempts to reach this goal in an unreasonable and overbroad manner. The reach of the Regulation is pervasive: under Defendants' policy, a student could not distribute copies of the Ten Commandments to friends in the hallways between classes, pass out copies of Thomas Paine's "Common Sense" in the lunchroom, or distribute invitations to a political debate or a prayer meeting at any time during the school day. See Newsom, 354 F.3d at 260 ("[T]he

---

[10] The Fourth Circuit has recognized that a second type of hybrid also exists: the "designated public forum," in which the government "makes public property (that would not otherwise qualify as a traditional public forum) generally accessible to all speakers." Id. This forum is subject to the same restrictions that govern a traditional public forum. Id.

10

number of examples of the unnecessarily broad nature of the [policy] is practically limitless."). Defendants' interest in eliminating congestion in the hallways and preventing littering may well justify a narrowly tailored prohibition. This prohibition, however, is not narrowly tailored, but rather sweeps broadly all forms of written non-curriculum based communication, from exhortations to pray at the flagpole to excerpts from Thomas Paine's "Common Sense," irrespective of their size, quantity, and manner of distribution. Therefore, the court finds that there is a strong likelihood that Raker will succeed on the merits of his First Amendment claim.

The remaining factors to be considered in awarding a preliminary injunction all weigh in favor of Raker. As to the alleged irreparable injury to Raker without an injunction, the Supreme Court has explained that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). With respect to the potential harm to the defendant if an injunction were issued, Defendants is "in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which . . . is likely to be found unconstitutional." Newsom, 354 F.3d at 261. Finally, given the importance of allowing the exchange of ideas in public schools and the possible chilling effect of the Regulation, the court concludes that an injunction limiting enforcement of the invalid restrictions would be in the public interest. Accordingly, the court will issue an injunction.

### III.

The Court recognizes that school administrators and teachers necessarily stand on the front line in enforcing order and discipline and their decisions are rightly entitled to great deference. However, other important values proscribe their discretion. Here, Raker is attempting

11

to engage in important civic and public discourse in a manner that has not been shown to be disruptive or otherwise corrosive to order and discipline. Accordingly, the court will enter a preliminary injunction enjoining the enforcement of Regulation 618R, as drafted, thereby permitting Raker to distribute his literature.[11]

**ENTER**: This January 19, 2007.

_____
UNITED STATES DISTRICT JUDGE

---

[11] Although the court enjoins the defendants from applying the policies as written, the court's opinion should not be read to prohibit defendants from taking reasonable steps to respond to disruptions at Millbrook High School when and if such disruptions occur, or from adopting and enforcing policies that are not inconsistent with this court's memorandum opinion.

12